NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 210239-U

NO. 4-21-0239

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 27, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Sangamon County |
| ROBERT A. POPE, | ) | No. 17CF416 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Ryan M. Cadagin, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Presiding Justice Knecht and Justice Steigmann concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The appellate court affirmed the defendant's conviction of second degree murder where the defendant proved the existence of a mitigating factor but the State negated the defendant's claim of self-defense. The court affirmed the defendant's sentence of 16 years' incarceration for second degree murder but vacated two of the convictions for second degree murder. Because defendant raised no argument regarding his conviction and sentence for aggravated unlawful use of weapons, the appellate court did not disturb the 3-year sentence of incarceration on that charge. Thus, the appellate court upheld defendant's aggregate sentence of 19 years' imprisonment.

¶ 2        Defendant, Robert A. Pope, appeals his convictions of second degree murder (720

ILCS 5/9-2 (West 2016)) and aggravated unlawful use of weapons (720 ILCS 5/24-1.6(a)(1),

(a)(3)(C) (West 2016)) after a bench trial. Defendant argues that his conviction of second degree

murder must be reversed because the State failed to disprove his affirmative defense of self-

defense. Defendant makes no argument regarding his conviction of aggravated unlawful use of

weapons. Defendant also contends that his sentence of 16 years' incarceration in the Illinois

Department of Corrections (DOC) for second degree murder was excessive. We vacate two of the defendant's convictions of second degree murder and affirm as modified.

¶ 3                                  I. BACKGROUND

¶ 4        On May 3, 2017, the Sangamon County grand jury returned a six-count superseding indictment charging defendant with four counts of first degree murder (720 ILCS 5/9-1(a)(1), (a)(2), (a)(3) (West 2016)) (counts I-IV) (count IV was charged as felony murder), one count of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2016) (count V)), and one count of "aggravated unlawful use of a weapon/vehicle/loaded/no FCCA" (720 ILCS 5/24-1.6(a)(1), (a)(3)(C) (West 2016) (count VI)). These charges stemmed from the April 25, 2017, shooting death of 32-year-old Adam Tayeh. Defendant pleaded self-defense. The evidence at defendant's bench trial showed the following.

¶ 5        On the evening of April 25, 2017, Chris Reid, who was headed southbound on Dirksen Parkway in Springfield, saw a northbound red Chevy pickup truck cut off a motorcycle. Reid heard the motorcycle driver yelling at the driver of the pickup truck. Reid watched as the motorcycle proceeded northbound on Dirksen and the pickup truck turned right onto Clear Lake Avenue and then left onto Hill Street.

¶ 6        At approximately 8:30 that evening, the police were dispatched to a "traffic accident" at the intersection of Hill Street and Enos Avenue. When they arrived, they found a motorcycle lying on Hill Street. Officer Rikki McMasters testified that the motorcycle driver's legs were around the motorcycle and his head was on the ground, as though he had fallen while riding the motorcycle. The motorcycle was facing north on Hill Street. Blood and a shell casing were on the pavement close to the motorcycle.

¶ 7        The police quickly discovered that the motorcycle driver had been shot twice in the back. The motorcyclist later died. He was identified as Tayeh. Tayeh had no firearm on or near his person. Nearby neighbors had heard two gunshots in quick succession and saw a speeding red pickup truck with stickers on the windows in the vicinity of Hill and Enos following the gunshots.

¶ 8        Officer Angela Royer discovered a camera mounted on the nearby home of Chris Letz. The camera faced toward Enos and captured video depicting the intersection of Hill and Enos. In viewing the video, Royer confirmed that what happened to Tayeh was no traffic accident but a "shots fired incident." According to Royer, the video showed the headlights of a truck, and then the headlight of a motorcycle, approaching the intersection of Hill and Enos. The vehicles did not collide. The truck "rearrange[d]" a few times followed by a "muzzle flash" and the motorcycle's headlight "tilt[ing] over." The truck "repositioned again" and then "took off." The State introduced this video as People's Exhibit No. 3 ("Letz video.")

¶ 9        Detective Don Bivens also viewed the Letz video. He testified that it showed a "larger vehicle at the intersection with a bike." Then, the larger vehicle "moved towards the bike," after which the vehicles were "stationary." Then, "I saw what looked like the bike kind of maybe moved to the west to avoid being—having contact with the truck or the car." Then, according to Bivens, he saw "what I thought appeared to be two flashes."

¶ 10       At nine that night, defendant called his friend, Nicholas Maximillian Adkins-Embry. According to Embry, defendant, in a "nervous and anxious" voice, told him to come to defendant's home. On his way, Embry passed the scene of the shooting. When he arrived at defendant's home, Embry asked defendant if the reason for the summons had "anything to do with what's going on down the street?" According to Embry, defendant was

pacing, extremely anxious and nervous, and was sweating. Embry described defendant as "very upset." Defendant told Embry that he "shot the guy." Defendant thought that he shot the guy twice, but, according to Embry, defendant did not "fully remember." Defendant told Embry that he was in an "altercation." Defendant told Embry that he had one shell casing in his car, but he "couldn't account" for the second shell casing. According to Embry, defendant seemed worried. Embry did not see a gun in defendant's possession that night, although he had previously seen defendant with a gun. Embry did not call the police because he was on probation for a cannabis offense. However, Embry called friends in Colorado, who he assumed would call the police.

¶ 11 In addition to calling Embry right after the shooting, defendant made other calls. The police later discovered that defendant deleted certain content from his phone.

¶ 12 The investigation that evening led to defendant as a suspect based on two telephone calls to Crime Stoppers. One of those calls was from Colorado. Local witnesses on the evening of the shooting had described the red pickup at the scene as having distinctive stickers on the back windshield. The police observed similar stickers on the back windshield of a red pickup truck belonging to defendant. During police surveillance of defendant's pickup, they observed defendant repositioning the truck in his driveway so that the stickers were not visible to passersby. During a search, the police recovered the gun used to kill Tayeh from a closed black plastic bag inside defendant's residence. Forensic examination of the gun showed that there were no fingerprints on the weapon. According to the forensic scientist who examined the weapon, the lack of fingerprints could happen if the gun had been wiped "intentionally or unintentionally." The parties stipulated that defendant did not have a valid Firearm Owner's Identification Card or a valid concealed carry permit on the date of the shooting.

¶ 13      Dr. Nathaniel Patterson, a forensic pathologist, testified to the following. The cause of Tayeh's death was "gunshot wound to the back." Dr. Patterson performed an autopsy on Tayeh's body on April 26, 2017. The external examination revealed that Tayeh was five feet eleven inches tall and weighed 247 pounds. Two entrance wounds were on Tayeh's back, and there was one exit wound on his chest. Dr. Patterson labeled the gunshot wound on Tayeh's upper back left of the spine "Gunshot #1" and the gunshot wound that entered the midback right of the spine, which exited the chest, "Gunshot #2." Dr. Patterson did not know which bullet struck Tayeh first. The bullet from Gunshot #1 entered Tayeh's back in a sharply upward trajectory, with little right-to-left deviation, and lodged at the back of his throat. The bullet from Gunshot #2 also traveled in an upward right-to-left direction, although less sharply upward, tore through the aorta, and exited through the heart. There was no stippling or gunpowder present around the wounds, indicating that Tayeh was shot from a distance. Dr. Patterson, though, did not examine Tayeh's clothing for gunpowder residue. (Through the testimony of a crime scene detective, the State established that there was no singeing, soot, or burns on the clothing.)

¶ 14      Because Tayeh was shot in the back, Dr. Patterson opined that the shooter was behind Tayeh. According to Dr. Patterson, if Tayeh were standing upright when he was shot, the shooter would have held the muzzle of the gun low and "pointed upwards." Dr. Patterson further opined that, if Tayeh had been facing away from the gun's muzzle while he was bent forward at the waist, the shooter would have held the muzzle of the gun parallel to the ground and aimed at Tayeh's upper body.

¶ 15      On cross-examination, Dr. Patterson testified that he did not know if the shooter was standing or sitting or whether Tayeh was standing or sitting. Nor could the doctor "definitively" opine whether Tayeh was "leaning over" when he was shot. Because the bullet

from Gunshot #2 veered sharply right to left, Dr. Patterson concluded that the shooter was positioned to Tayeh's right when that shot was fired. Dr. Patterson testified that, because Gunshot #1 was "sharply upward," it is possible that bullet struck Tayeh as he was falling. According to Dr. Patterson, "[a]nything that would explain [Tayeh] bending forward that would make [him] more horizontal" would account for Gunshot #1's trajectory.

¶ 16    Detective Timothy Zajicek testified on the State's direct examination to the investigative steps he took that led to defendant's arrest the morning after the shooting. Zajicek also took measurements of Tayeh's motorcycle. From the seat of the motorcycle to the ground measured 34 inches. According to Zajicek, Tayeh's motorcycle was "smaller than most motorcycles." On cross-examination, Zajicek testified that he reviewed two videos captured by cameras mounted on a business known as Mike Williams Plumbing and Heating, which was located near the intersection of Hill and Clear Lake. These videos depicted the time and location of the shooting. Zajicek testified that, in both videos, a vehicle Zajicek identified as defendant's truck was traveling northbound on Hill at a normal rate of speed. Zajicek testified that the second video depicted a motorcycle coming southbound on Hill at a greater than normal speed passing by defendant's pickup truck, and then executing a U-turn "[a]lmost immediately" and following the truck. These videos were introduced into evidence as Defendant's Exhibit No. 7 ("Mike Williams videos.")

¶ 17    Detective Lori White testified that from the ground to the bottom of the driver's side window of defendant's truck measured four feet, eight inches. She testified that from the ground to the top of the driver's seat measured three feet, five inches.

¶ 18    Rachael Nickell testified that she had been Tayeh's girlfriend. Nickell testified that Tayeh owned a "very small" motorcycle. According to Nickell, Tayeh's motorcycle was

- 6 -

"two feet off the ground." Nickell testified that she went to the scene as soon as she learned that Tayeh had been shot. She testified that Tayeh had a friend who lived in the neighborhood where the shooting occurred.

¶ 19   After the court denied defendant's motion for a directed finding, Brea Williamson testified for defendant. On the night of the shooting, she was defendant's girlfriend. However, by the time of trial, their relationship had "disintegrated." After the relationship ended, Brea obtained an order of protection against defendant but had since dismissed it because he agreed not to contact her.

¶ 20   In the early evening of April 25, 2017, Brea and defendant dropped their baby daughter off at Brea's father's home in Jerome and then went to the Texas Roadhouse in Springfield for dinner. Defendant was driving his red pickup truck. According to Brea, defendant's truck had a "lifted" suspension that was "very" much higher than a standard truck, so much so that it was difficult to get the child car seat in and out of the truck. Brea testified that the truck also had "pretty dark" tinted windows that made seeing out difficult.

¶ 21   According to Brea, after she and defendant finished dinner, they picked up their daughter and were driving to their home on Grand in Springfield. They were northbound on Dirksen, approaching the intersection with Clear Lake. A motorcycle was traveling in the northbound lane to their left. Defendant and the motorcycle stopped for a red light at Clear Lake. The driver of the motorcycle was waving his arms "aggressively" and accusing defendant of having cut him off. According to Brea, defendant apologized, but the motorcyclist remained upset. Defendant told the cyclist, "F*** you, I don't have to deal with this."

¶ 22   Brea testified that the light turned green, and defendant turned onto Clear Lake and then moved into the left-hand lane to turn onto Hill. According to Brea, as they proceeded

onto Hill, a single headlight came toward them in the gathering darkness. Brea realized that the oncoming driver was the motorcyclist they had encountered on Dirksen. The cyclist "put his hands on his chest and threw his hands in the air," as he passed defendant's truck. Brea was "very scared." According to Brea, her six-month-old daughter was in the seat immediately behind her. Brea then watched the cyclist stop in the road behind them, turn his bike around, and pursue them, gaining speed.

¶ 23     According to Brea, defendant stopped at the stop sign at Hill and Enos. The motorcycle then pulled "alongside" the truck's driver's side. Defendant rolled down his window. Brea testified that the cyclist was "threatening" defendant. Defendant told the cyclist to get away from the truck and "moved the [truck] forward." The cyclist said something else to defendant that Brea did not recall. Defendant then moved the truck "backwards." The truck was a "few ***
feet" further away from the motorcycle than when the motorcycle had pulled up at the stop sign. According to Brea, the truck was "a little bit behind" the motorcycle. The cyclist told defendant that he was going to call his brother and that defendant "was a dead man." Brea testified that the cyclist then reached "up" with his right hand, and she saw the back of the cyclist's jacket "lift up." According to Brea, at that instant, defendant's "gun was out of the truck" and "out the window." According to Brea, in that instant, the gun "went off" and she screamed. Defendant then "drove away."  Brea testified that they went home. They did not call the police or 911.

¶ 24     On cross-examination, Brea admitted that she told the police the next day that the child was still with Brea's father and was not in the truck when the incident happened. Brea testified that she was afraid to tell the police that her child had been with her when the shooting happened because she thought the police would notify the Illinois Department of Children and Family Services (DCFS). Brea also did not tell the police that the cyclist said, "You're a dead

man." Brea admitted that she told the police the truck's tinted windows were so dark that she did not see the motorcycle on Dirksen. Brea agreed that defendant could have driven away from the scene where the shooting occurred, but instead, he maneuvered his truck behind the motorcycle. Brea told the police the day after the shooting that all she could see on Hill was that the cyclist wore dark clothing and that she did not see "what was happening." Brea admitted that she grabbed defendant's arm when she saw the gun. Brea told the police she admonished defendant that he "can't be doing s*** like this." Brea testified, "There was no stopping him."

¶ 25      Gary Williamson, Brea's father, testified that he babysat defendant and Brea's child for about an hour on the evening of April 25, 2017. According to Williamson, defendant picked the child up after he and Brea had dinner at the Texas Roadhouse and then they headed home.

¶ 26      Defendant testified as follows. On April 25, 2017, he was 27 years old. After dinner that evening, he and Brea picked the baby up from Brea's father and headed home. Defendant was driving his red pickup truck. He had a gun tucked into the front seat next to the console, for protection. Defendant testified that his home had been broken into and the area where he lived was "dicey."

¶ 27      As defendant drove north on Dirksen, he changed lanes to avoid colliding with a car that had come to a sudden stop. Defendant was not aware of cutting off a motorcycle when he made that maneuver. While defendant was stopped at a red light at the intersection with Clear Lake, a motorcyclist to his left angrily accused defendant of cutting him off. Defendant apologized, but the cyclist "did not accept that." Eventually, defendant turned right onto Clear Lake and then made a left turn onto Hill. No one was behind him. According to defendant, there were streetlights every 50 feet on Hill.

¶ 28 Defendant was traveling northbound on Hill when a single headlight coming toward him caught his attention. Defendant soon recognized that the headlight was on the motorcycle driven by the gentleman with whom he had words on Dirksen. Defendant testified that he became "worried." According to defendant, the cyclist took his hands off the handlebars and started "beating on his chest." Defendant testified: "To me, that means he wanted to fight." Defendant testified that he was "not really a fighter," so he was "pretty scared."

¶ 29 Defendant continued traveling north on Hill Street, watching the motorcycle in his rearview mirror. The motorcycle stopped in the roadway. Defendant testified that he now "fear[ed] for my safety." Defendant testified: "I don't know what this guy is gonna do, and, also, I had my family in the vehicle, so I'm worried about them."

¶ 30 According to defendant, the motorcycle "did a U-turn," headed north, and gained on defendant's rear, rapidly. Defendant testified: "I'm pretty scared. I've never really been chased down *** before." "[T]his guy clearly wanted to fight," defendant said. Defendant testified: "I could tell he was a big guy[,] and he wasn't going to let it go."

¶ 31 Defendant testified that the motorcycle "was rapidly approaching my truck." The next thing defendant did was stop at the stop sign at the intersection of Hill and Enos. Defendant testified that the motorcycle was "angled" in the middle of the road, and "he's going to come up next to my truck." The motorcycle pulled up next to him. Defendant testified that he was "terrified" and "freaked out" because Hill was a rural road empty of people. Defendant testified that he did not know what the cyclist was "capable of." Nevertheless, defendant testified that he stayed stationary because he did not want to "run through" a stop sign. Neither defendant nor Brea called 911.

¶ 32        Defendant testified that he rolled down his window. Through his open window, defendant heard the cyclist kick his truck. Then, defendant told the cyclist to "get away from my vehicle and leave me alone." Defendant testified that, at that point, he was "freaking out" because the cyclist was "very violent, very aggressive." Defendant, who is left-handed, put his gun under his left thigh with his left hand. Defendant testified that his truck was on the right side of the road, "sitting at the stop sign." Defendant testified that he put the gun under his thigh because "I wanted to be prepared for whatever [the cyclist] might do. *** I felt he was armed, so I wanted to be ready if he tried to do anything crazy." Defendant testified that he thought the cyclist was armed due to the cyclist's tone of voice and the language he was using. Defendant testified: "Nobody would do that reasonably and not be armed."

¶ 33        Then, defendant decided to leave, so he turned left onto Enos. Defendant traveled approximately six feet when the cyclist yelled that defendant was trying to "run him over." Defendant testified that he "jinked" the truck quickly to the right and then backed up to the stop sign on Hill. Defendant testified that he did not keep going away from the scene because it was clear the cyclist was going to follow him, and defendant did not want the man to follow him home.

¶ 34        Defendant then was five to seven feet behind the motorcycle. Defendant testified that he wanted to be behind the motorcycle so he could see the cyclist "and whatever he was doing." Defendant testified that the cyclist was "standing up straight, straddling the bike." The motorcycle was forward and to the truck's left. The cyclist said to defendant, "You're a dead man," used an expletive, and moved his arm toward his waist. Thinking the cyclist was reaching for a gun, defendant fired his gun twice at the cyclist. Defendant testified: "I believed [the

cyclist] was reaching for a pistol. *** I assumed he was armed because of how violent he was being, and I just—everything—told me that he was armed."

¶ 35        Defendant testified that he did not call 911 but instead went home "in a panic." Defendant testified that he put the gun with a holster and "whatever I thought the police would want" into a plastic bag and set the bag on stairs leading to his basement. According to defendant, he could have thrown the gun into a field behind his house if his intention were to hide it from the police. Defendant testified that the police arrested him the next morning.

¶ 36        On cross-examination, defendant admitted that, when the motorcycle encountered him on Hill, he had two opportunities to get off isolated Hill Street and go back to Dirksen, which is a busy thoroughfare. Defendant agreed that, at the intersection of Hill and Carpenter, he could have diverted onto Carpenter and then gone back to Dirksen. Defendant also agreed that he could have diverted onto Enos and gone back to Dirksen. Defendant also admitted that because Hill Street was deserted, he could have gone through the intersection at Enos without stopping, "[i]f I wanted to run through a stop sign."

¶ 37        Defendant further admitted that he never a saw a gun in the cyclist's hand. Defendant agreed that the next day, he spoke to Brea from the county jail and expressed dismay that Embry had "snitched." Defendant also admitted that he told the police the next day that he did not know what had happened. Defendant denied telling Brea the next day that he did not blame Brea for allowing the police to find the plastic bag containing the gun.

¶ 38        After defendant's testimony, the defense rested. The State presented one rebuttal witness who testified that the police did not threaten Brea with calling DCFS over the child's presence in the truck when the shooting happened. The State also presented a stipulation that, during the recorded telephone call between defendant and Brea the day after the shooting,

defendant said, "Not your fault," when Brea told him that the police had found the plastic bag containing the gun.

¶ 39　　　　Before retiring to deliberate, the court viewed the Letz video in open court. On counts I, II, and III of the indictment, the court found defendant guilty of the "lesser mitigated offense" of second degree murder. The court also found defendant guilty of aggravated unlawful use of a weapon (count VI). Tacitly, the court acquitted defendant of the remaining charges.

¶ 40　　　　On February 5, 2021, defendant filed a posttrial motion seeking a judgment notwithstanding the verdict or, alternatively, a new trial. On April 6, 2021, the court continued the hearing on defendant's posttrial motion but proceeded to sentencing. At the sentencing hearing, Zajicek testified that the murder weapon recovered from defendant's home had been stolen prior to the Tayeh shooting. Zajicek also testified that a sign in defendant's yard and stickers on his truck warned that the owner was "aggressive in the protection of his property with firearms." According to Zajicek, police found knives during a search of defendant's truck. Defendant expressed remorse for the shooting and stated that he never went out armed that evening intending for it to happen. Tayeh's sister, Sara Danner, delivered a victim impact statement. The court orally merged the convictions on counts I through III (first degree murder) of the superseding indictment and sentenced defendant to a term of 16 years' incarceration for second degree murder, to be served consecutively to a 3-year sentence of imprisonment on count VI (aggravated unlawful use of weapon) for an aggregate sentence of 19 years' imprisonment. (Defendant is not challenging the 3-year sentence.) However, the written judgment order reflects separate convictions and concurrent sentences on three counts of second degree murder.

¶ 41　　　　On April 20, 2021, defendant filed a motion to reduce sentence, and on April 21, 2021, defendant filed an amended posttrial motion. On April 29, 2021, the court denied those

motions. In denying the motion to reduce the sentence, the court noted that it had considered all of the factors in aggravation and mitigation when sentencing defendant.

¶ 42　　　　This timely appeal followed.

¶ 43　　　　　　　　　　　　II. ANALYSIS

¶ 44　　　　Defendant first contends that the State did not disprove his affirmative defense of self-defense. See *People v. Hooker*, 249 Ill. App. 3d 394, 400 (1993) ("Self-defense, once raised, places the burden upon the State to disprove it beyond a reasonable doubt."). The State charged defendant with four counts of first degree murder, alleging alternatively that he shot Tayeh without lawful justification and (1) with intent to kill or do great bodily harm, (2) knowing such act would cause death, (3) knowing such act created the strong probability of death or great bodily harm, and (4) while committing a forcible felony, namely, aggravated discharge of a firearm. Defendant pleaded the affirmative defense of self-defense. The court found defendant guilty of second degree murder. (The court acquitted defendant of count IV, felony murder).

¶ 45　　　　Second degree murder is a lesser mitigated offense of first degree murder. *People v. Brown*, 2014 IL App (4th) 120887, ¶ 24. A person is guilty of second degree murder when the elements of first degree murder are established but there also exists a statutory mitigating factor. *Brown*, 2014 IL App (4th) 120887, ¶ 24. Put differently, "[s]econd degree murder differs from first degree murder only because of the presence of a mitigating factor." *People v. Porter*, 168 Ill. 2d 201, 213 (1995). The form of second degree murder present here is known as "imperfect self-defense." See *People v. Jeffries*, 164 Ill. 2d 104, 113 (1995). Section 9-2(a)(2) of the Criminal Code of 2012 (Code) (720 ILCS 5/9-2(a)(2) (West 2016)) sets forth the following as a mitigating factor that reduces first degree murder to second degree murder:

"[A]t the time of the killing [the defendant] believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his or her belief is unreasonable."

Under section 9-2(c) of the Code (720 ILCS 5/9-2(c) (West 2016)), when evidence of a mitigating factor has been presented, the defendant has the burden to prove that factor by a preponderance of the evidence before he or she can be found guilty of second degree murder. However, the burden remains on the State to prove each element of first degree murder beyond a reasonable doubt and, when appropriately raised, the absence of the mitigating factor. 720 ILCS 5/9-2(c) (West 2016). Put more simply, the imperfect self-defense form of second degree murder occurs when the evidence is sufficient to prove that the defendant believed he or she was acting in self-defense, but that belief is objectively unreasonable. *Jeffries*, 164 Ill. 2d at 113.

¶ 46 To convict a defendant of either first degree or second degree murder, the State must prove beyond a reasonable doubt the elements of first degree murder. *People v. Staake*, 2016 IL App (4th) 140638, ¶ 63. Only after the trier of fact determines that the State has met its burden does the trier of fact consider whether a mitigating factor is present. *Staake*, 2016 IL App (4th) 140638, ¶ 63. Because first degree murder and second degree murder have the same elements, they are subject to the same defenses. *People v. Staake*, 2017 IL 121755, ¶ 41. "Self-defense defeats both charges because it negates one of the elements of the crime—that the killing be unjustified." *Staake*, 2017 IL 121755, ¶ 41. Where there is evidence of both first degree murder and second degree murder, and the defendant presents a claim of self-defense, the State must prove beyond a reasonable doubt " 'not only the elements of first degree murder, but also that the defendant was not justified in using the force that he used.' " *People v. Spiller*, 2016 IL App (1st) 133389, ¶ 30 (quoting *Jeffries*, 164 Ill. 2d at 128). A defendant's conviction of

second degree murder indicates that the trier of fact concluded that the evidence was insufficient to support a claim of self-defense but that the defendant has proven, by a preponderance of the evidence, the existence of a mitigating factor " 'sufficient to reduce the offense of murder to second degree murder.' " *Spiller*, 2016 IL App (1st) 133389, ¶ 30 (quoting *Jeffries*, 164 Ill. 2d at 129).

¶ 47      Defendant challenges his second degree murder conviction, arguing that the State failed to negate the elements of self-defense. Self-defense consists of the following elements: (1) unlawful force was threatened against a person, (2) the person threatened was not the aggressor, (3) the danger of harm was imminent, (4) the use of force was necessary, (5) the person threatened actually and subjectively believed a danger existed that required the use of the force applied, and (6) those beliefs were reasonable. *People v. Lee*, 213 Ill. 2d 218, 225 (2004). If the State negates any of these elements, the defendant's claim of self-defense fails. *Lee*, 213 Ill. 2d at 225. We will not set a criminal conviction aside unless the evidence is so unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Rader*, 272 Ill. App. 3d 796, 804 (1995). When the defendant challenges the sufficiency of the evidence, we will sustain a conviction if, after viewing the evidence in the light most favorable to the State, " '*any* rational trier of fact could have found the elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Rader*, 272 Ill. App. 3d at 804 (quoting *People v. Collins*, 106 Ill. 2d 237, 261 (1985)).

¶ 48      In finding defendant guilty of second degree murder, the court perforce concluded that the evidence of self-defense was insufficient. The reasonableness of a defendant's subjective belief that deadly force was justified is a question of fact. *Hooker*, 249 Ill. App. 3d at 400. The court also necessarily determined that defendant proved that he subjectively believed he was

acting in self-defense but his belief was objectively unreasonable. See *People v. Washington*, 2012 IL 110283, ¶ 37 (stating if the trier of fact finds that the defendant had a subjective belief, it can find that belief to be either objectively reasonable or objectively unreasonable). In his ruling, the judge stated that he considered all of the evidence, including the exhibits, the testimony, credibility of the witnesses based on in-court observations of their demeanor, and all applicable law. The court did not set forth its credibility findings on the record. However, in finding defendant's belief that he was acting in self-defense objectively unreasonable, the court could justifiably have found defendant's testimony as to the events immediately surrounding the shooting not credible. See *Washington*, 2012 IL 110283, ¶ 35 (stating conviction of second degree murder demonstrates that, after the defendant has presented the " 'best evidence for his defense, the trier of fact has concluded that the evidence only supports a finding of second degree murder and not absolute justification for the defendant's actions.' " (quoting *Jeffries*, 164 Ill. 2d at 129)).

¶ 49　　　　Here, defendant testified that Tayeh was standing upright over his motorcycle five to seven feet in front of defendant's truck when Tayeh said, "You're a dead man," and reached toward his waist. Brea testified that she heard the same words (prefaced by "I will get my brother") and saw a similar gesture. Defendant testified that, upon hearing those words and seeing Tayeh reach toward his waist, defendant shot Tayeh twice. However, defendant shot Tayeh twice in the back, and Tayeh was unarmed. Defendant never saw a gun. Defendant only assumed that Tayeh was armed because of Tayeh's aggressive attitude. On cross-examination, Brea admitted that she told the police that she saw Tayeh's dark clothing but did not see what happened.

¶ 50        Bivens testified that the Letz video showed the motorcycle move to the west to avoid the truck *before* the gunshots were fired. Bivens testified: "I saw what looked like the bike kind of maybe moved to the west to avoid being—having contact with the truck or the car." Then, Bivens saw "what I thought appeared to be two flashes." In the Letz video, which this court has reviewed, the truck approaches the intersection ahead of the motorcycle, stops at the stop sign, and sits there while the motorcycle approaches and stops next to where the driver's door of the truck would be. Then, the truck pulls forward around the motorcycle and backs up behind the bike. The motorcycle then moves to the right of the screen before the flashes and before the motorcycle dropped to the ground. This means that Tayeh was *driving the motorcycle away from defendant* and was not standing upright over the bike, reaching for his waist, when defendant fired his gun. Photographs in evidence show the fallen motorcycle at the extreme west edge of Hill Street. Even though the paramedics had "flipped" the motorcycle before those pictures were taken, the motorcycle would still have been west of the stop sign when it fell. Defendant testified that he stopped his truck on the east side of the road next to the stop sign.

¶ 51        That Tayeh was driving the motorcycle away from the shooter is also corroborated by Dr. Patterson, who testified that the severe upward angle of Gunshot #1 could be explained by Tayeh having been bent forward horizontally when he was shot. According to Dr. Patterson, Gunshot #2 also had an upward trajectory, although less steep than Gunshot #1. Thus, the evidence contradicts defendant's testimony that Tayeh was standing up straight over the bike. Defendant now posits that Tayeh could have been leaning forward as he reached for his waist, accounting for the slight upward trajectory of Gunshot #2. However, at trial, defendant testified that Tayeh was "standing up straight" and "straddling [the bike]" when Tayeh reached for his waist and defendant shot him. In other words, defendant's version at trial was that Tayeh was

standing stationary when defendant fired. The Letz video contradicts defendant's account. We also know from Dr. Patterson's testimony that if Tayeh were standing up straight when he was shot, the shooter would have held the gun low and fired upward. Yet, Brea testified that defendant held the gun outside the truck's window, which was almost five feet off the ground.

¶ 52 Defendant unsuccessfully attempts to reconcile the Letz video with his version of events. Defendant concedes that the Letz video depicts the motorcycle moving away from the truck before the shots were fired, but he argues that the video is too grainy to show Tayeh reaching for his waist before the shots were fired. This argument accounts for Tayeh driving away from the truck but ignores defendant's testimony that he shot Tayeh while Tayeh was standing up straight. Defendant also argues that, according to the Letz video, the entire encounter was only 22 seconds. Given the brevity of the encounter, a rational trier of fact could have found that Tayeh simply had no time to approach the truck, kick the truck, straddle his motorcycle, issue threats, and reach for his waist.

¶ 53 Because the evidence supports the court's finding that defendant's belief that he needed to use deadly force was objectively unreasonable, we also conclude that the evidence supports the court's rejection of defendant's self-defense claim. The sixth element of self-defense is that the defendant's beliefs must be objectively reasonable. *Lee*, 213 Ill. 2d at 225. If the State negates any element of self-defense, that defense fails. *Lee*, 213 Ill. 2d at 225. Therefore, we confine our analysis of self-defense to the sixth element. Defendant argues that his belief that Tayeh was going to shoot him was objectively reasonable because each of Tayeh's actions was "more threatening, if not violent, than the last."

¶ 54 We discussed the evidence that Tayeh was driving away from defendant when defendant shot him. Regarding the evidence that defendant feared that Tayeh would kill him,

defendant testified to his increasing worry and anxiety as the motorcycle gained on his rear after it made the U-turn on Hill. However, defendant's actions tell a different story.

¶ 55   On cross-examination, defendant admitted that he could have taken either Carpenter or Enos back to Dirksen, which was a populated thoroughfare, to escape danger. He did neither. Most telling, both defendant and Brea had cell phones, but neither one called 911. Then, defendant, who said he was "terrified" and "freaked out" by the motorcycle chasing him down, stopped at the stop sign on Hill and waited for the motorcycle to come abreast of the truck. Although defendant testified that he was "terrified" of Tayeh, defendant rolled down his window when Tayeh approached him.

¶ 56   Defendant testified that he continued sitting at the stop sign. Defendant—who used a stolen gun to shoot Tayeh, fled the scene, wiped the gun clean of fingerprints, hid the gun, deleted contents of his cell phone, and lied to the police about the killing—asked the trial court to believe that he had scruples against running a stop sign.

¶ 57   Defendant testified that he was afraid to leave the scene because he might run over Tayeh. However, when defendant turned onto Enos, Tayeh was still on Hill Street. Brea testified that nothing prevented defendant from escaping down Enos. Defendant testified that he did not want Tayeh following him home, but Tayeh did not follow him onto Enos. The court could have found that neither of defendant's explanations for returning to the confrontation was remotely plausible. We, thus, conclude that the trial court could have found defendant's testimony that he feared for his life not credible.

¶ 58   Defendant's reliance on *People v. Motuzas*, 352 Ill. 340 (1933), is misplaced. Our supreme court reversed the defendant's murder conviction where the evidence showed that the defendant shot and killed one Smanda in self-defense. *Motuzas*, 352 Ill. at 347. In *Motuzas*,

- 20 -

Smanda "immediately," upon seeing the defendant, "took after him," without the "interchange of words between them." *Motuzas*, 352 Ill. at 345. The defendant "showed by his quick retreat that he considered Smanda an enemy." *Motuzas*, 352 Ill. at 345. The court noted that the defendant's "first action was not to make use of the gun," but to endeavor to "escape from his assailant." *Motuzas*, 352 Ill. at 346. The defendant ran up some stairs and tried to escape into a building, but the door was locked. *Motuzas*, 352 Ill. at 344. The defendant then shot Smanda, who was pursuing the defendant up the stairs. *Motuzas*, 352 Ill. at 344. Here, defendant did not flee as his first action, although he had several opportunities to escape. Then, when defendant decided to leave the scene, he quickly changed his mind and returned to the confrontation. In our case, it was Tayeh who was moving away from defendant when defendant shot him in the back.

¶ 59　　　　　Defendant's reliance on *People v. White*, 87 Ill. App. 3d 321 (1980), is also misplaced. In *White*, the assailant went up the stairs toward the defendant's apartment, brandishing a knife and threatening the defendant's life when the defendant fired one shot, killing the assailant. *White*, 87 Ill. App. 3d at 322-23. The court held that the defendant's response "under the exigencies that existed at the moment," on the basis of "quickly unfolding events," demonstrated that the defendant acted in self-defense. *White*, 87 Ill. App. 3d at 323. Here, defendant had numerous opportunities to avoid killing Tayeh. Defendant could have called 911 as soon as the motorcycle made the U-turn on Hill. Defendant could have diverted off Hill at Carpenter and again at Enos. When defendant finally decided to leave the scene, he could have kept going on Enos and escaped. Instead, he deliberately and literally backed into the deadly confrontation.

¶ 60　　　　　Finally, defendant relies on *People v. Kelly*, 24 Ill. App. 3d 1018 (1975), which favors the State. In *Kelly*, the defendant aimed a gun at the victim, who "had not struck an attack

posture," and "immediately shot" the victim. *Kelly*, 24 Ill. App. 3d at 1027. The court held that the evidence was insufficient to prove self-defense. *Kelly*, 24 Ill. App. 3d at 1027-28. Here, although defendant and Brea testified that Tayeh gestured toward his waist, the Letz video clearly shows that defendant shot Tayeh while Tayeh was driving the motorcycle away from defendant. Tayeh, therefore, was not in an "attack posture" any more than the victim was in *Kelly*. Accordingly, based on all the above, we hold that a rational trier of fact could have found defendant guilty beyond a reasonable doubt of second degree murder.

¶ 61    Next, defendant contends that his sentence of 16 years' incarceration for second degree murder was excessive, considering the "underlying circumstances" and defendant's lack of criminal history. As noted, defendant does not challenge his sentence for aggravated unlawful use of weapons. A trial court's sentence is " 'entitled to great deference' " and will not be reversed absent an abuse of discretion. *People v. Cunningham*, 2018 IL App (4th) 150395, ¶ 48 (quoting *People v. McGuire*, 2017 IL App (4th) 150695, ¶ 38). " 'A sentence within the statutory range will not be deemed excessive, and will not be disturbed, unless it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense.' " *Cunningham*, 2018 IL App (4th) 150395, ¶ 48 (quoting *People v. Harris*, 2015 IL App (4th) 140696, ¶ 55). Second degree murder is a Class 1 felony (720 ILCS 5/9-2(d) (West 2016)) with a sentencing range of 4 to 20 years' incarceration (730 ILCS 5/5-4.5-30(a) (West 2016)).

¶ 62    Defendant argues that his sentence is excessive considering he (1) did not create the circumstances that led to Tayeh's death and (2) acted under strong provocation. Although Tayeh initiated the confrontation on Dirksen and then spun his motorcycle around to follow defendant's truck up Hill Street, defendant did not use opportunities to avoid the fatal

confrontation. If defendant were "terrified" and "freaked out," he inexplicably stopped at the stop sign on Hill and waited for the motorcycle to come abreast of him. Then, when defendant decided to leave the scene, he changed his mind and backed around behind Tayeh. Defendant's testimony that Tayeh threatened him and reached for his waist when defendant fired is contrary to the evidence. Tayeh was moving away from defendant when defendant fired. The evidence established all of the elements of first degree murder. Nevertheless, though there was slim evidence even of defendant's subjective belief that deadly force was necessary, the trial court found the existence of the mitigating factor of "imperfect self-defense."

¶ 63    Defendant maintains that he had no "real" criminal record. In 2008, defendant was convicted of misdemeanor possession of cannabis. In 2009, defendant was convicted of misdemeanor retail theft. In January 2015, defendant was held in contempt for failure to pay child support and sentenced to periodic imprisonment. While serving that sentence, he was ticketed for multiple jail infractions. Defendant was sentenced to DOC as a juvenile in 2007 for reckless discharge of a firearm (reduced from armed violence) after having admitted probation violations.

¶ 64    Defendant asserts that he expressed remorse at sentencing and that his lethal conduct was "contained within a specific set of circumstances." The evidence showed that the gun used to kill Tayeh was stolen. Instead of calling 911 or the police, defendant fled the scene and then attempted to conceal his involvement by wiping the gun clean of fingerprints and hiding it in a black plastic bag. He did not give the bag to the police. They found it while executing a search warrant at his house. After defendant's arrest, he assured Brea that the police finding the gun was not her fault. Defendant faulted Embry, however, for being a "snitch." Defendant's truck was distinctive because of the stickers on the back windshield. When the police were

surveilling defendant's home, they watched as he repositioned the truck so that the stickers were not visible to passersby. These were not remorseful actions.

¶ 65    According to Zajicek's testimony at sentencing, one of the stickers on defendant's truck depicted a person urinating on the words "gun control." Another sticker depicted the muzzle of a revolver with the words "nothing in this truck is worth dying for." According to a motion *in limine* filed by defendant, he kept a sign in his front yard stating "WARNING—Due to price increases on ammo, do not expect a warning shot" and "survivors will be shot again!" In addition to the murder weapon, the police found other guns in defendant's residence and knives in his truck. These facts militate against defendant's claim that his lethal conduct was solely the product of unfortunate circumstances unlikely to recur.

¶ 66    Finally, defendant argues that a 16-year sentence of incarceration for second degree murder is not a deterrence because defendant shot Tayeh in self-defense. We have discussed at length why the record does not support self-defense. Accordingly, we hold that the sentence of 16 years' incarceration for second degree murder was not an abuse of discretion.

¶ 67    However, pursuant to Illinois Supreme Court Rule 366(a)(3) (eff. Feb. 1, 1994), we vacate the judgments on counts II and III of the superseding indictment. At sentencing, the court orally merged the convictions of second degree murder on counts I, II, and III. However, the written judgment reflects separate convictions on each count. " 'When the oral pronouncement of the court and the written order are in conflict, the oral pronouncement controls.' " *People v. Maxey*, 2015 IL App (1st) 140036, ¶ 46 (quoting *People v. Carlisle*, 2015 IL App (1st) 131144, ¶ 87).

¶ 68    III. CONCLUSION

- 24 -

¶ 69       For the reasons stated, we affirm the trial court's judgment in part and vacate it in

part.

¶ 70       Affirmed in part and vacated in part.